(38 South. 132.)

No. 15,270.

PELLETIER v. STATE NAT. BANK.*

(Jan. 4, 1905.)

BANKS—ACTION ON NOTES—EVIDENCE—BURDEN OF PROOF.

1. In a suit on bank notes purporting to have been issued in 1856, and which are genuine on their face, mere possession makes out a prima facie case in favor of the holder; and the burden of proof rests on defendant to show, as alleged, that such notes were not issued by its predecessor bank, but were lost or stolen, and that plaintiff acquired the same in bad faith or with notice.

2. Where the evidence shows that such notes were not issued or put in circulation, but were lost or stolen, and came into plaintiff's possession in 1901, and his own account of how he acquired same is either false, or shows a purchase from an "old woman," not named or identified, for the insignificant price of $25, more or less, for above $10,000 of notes of a solvent bank, plaintiff will be treated as a finder of such notes, or as having acquired the same with notice of all the facts, and subject to all equities.

3. Where the evidence shows that plaintiff, through the interposition of third persons acting as his secret agents, and prior to the institution of this suit, collected from defendant bank some of the notes so found or acquired by him, and that such payments were made by the officers in ignorance of the facts of the case, plaintiff will be condemned to restore the money thus unduly received by him.

(Syllabus by the Court.)

*Rehearing denied February 27, 1905.

Appeal from Civil District Court, Parish of Orleans; Walter Byers Sommerville, Judge.

Action by J. B. Pelletier against the State National Bank. Judgment for plaintiff, and defendant appeals. Reversed.

See 112 La. 564, 36 South. 592.

William Stirling Parkerson, for appellant. Edwin Howard M'Caleb and Hubert Marion Ansley, for appellee.

LAND, J. On April 18, 1902, plaintiff filed his petition alleging that the defendant corporation owed him $9,185, with 5 per cent. interest thereon from March 19, 1902, until paid, as "the holder and owner, bona fide, and for a valuable consideration, acquired in the usual course of business," of certain bank notes issued by the Louisiana State Bank on April 11, 1856. The notes are described in the petition as $5 and $10 bills of certain series, duly signed by the officers of said bank.

It is unnecessary to repeat the allegations of the petition showing that the defendant corporation in 1870 became the successor of the Louisiana State Bank, and, as such, bound for its obligations, and that the latter was authorized in 1856 to issue bank bills, as such allegations are admitted to be true. The petition alleged presentment of said bills for payment to defendant bank on March 19, 1902, and its refusal to pay the same.

The answer admitted the execution of the bills sued on, but averred that the plaintiff was not a bona fide holder, having obtained possession "surreptitiously and without legal right or valid consideration."

The answer charged that plaintiff knew that said notes had not been issued or put in circulation by the bank, and that the party or parties from whom he obtained them were not in lawful possession of the same.

The answer further charged that plaintiff had a few of said notes presented by differ- ent persons at different times to the bank for payment, in order not to arouse suspicion, and that such notes for small amounts were paid in error, from time to time, and that the suspicion of the bank officials was not aroused until a demand was made for the payment of notes exceeding $4,000 in the aggregate, whereupon the books of the old bank were examined, and it was then discovered that the said notes had never been issued or put in circulation, but had been lost or stolen, and the defendant so averred.

The answer pleaded further the prescription of 10 and 30 years, and alleged that plaintiff had, in bad faith, and through different persons, collected, and defendant had paid, in error, from time to time, similar notes aggregating $1,180, which sum defendant claimed in reconvention, with interest from December 26, 1901.

The case was tried, and there was judgment in favor of the plaintiff, from which defendant prosecutes this appeal.

The judgment of the court a qua was based on the following propositions, to wit:

"The defense that the instruments sued on were lost cannot prevail, for the reason that the bank has not conformed to the requirements of the law as contained in articles 2279, 2280, Civ. Code.
"The defense that they were stolen must be shown by affirmative testimony, and that plaintiff had knowledge of the theft at the time he acquired possession of them. This the bank has failed to do."

In his opinion the trial judge said:

"The testimony to show that the bills or notes were never issued is barely sufficient for that purpose, although this fact may be considered here as proved."

It is clear that this case is not one where a lost instrument is made the foundation of a suit or defense, because the instruments sued on were produced and filed in evidence. Hence the articles of the Civil Code cited, permitting the introduction of secondary evidence of the contents of an instrument lost or destroyed, and in the former case requir-

ing advertisement of loss, have no application.

The defense set up in the answer was that the notes sued on were not issued and put in circulation by the bank, but were lost or stolen, and that the plaintiff's possession of the same was in bad faith. Hence the contention that the notes were lost should have been considered as an element in the determination of the case, which seems to have been decided on the theory that plaintiff was entitled to recover, because the defendant had failed to prove affirmatively that the bills were stolen, and plaintiff had knowledge of the theft.

The bills in question were signed by the proper officers of the bank, and were apparently valid on their face.

The bank kept a record of all bills issued during its existence. In this record such bills were denominated "checks," and on the top of each page the denomination is given thus: "Five Dollars Checks." Immediately following appears a statement or procès verbal in form as follows:

"Payable to Bearer and numbered and dated by ——— and signed by ——— Pres. and ——— Cashier ——— dated ——— 1856. "Issued per Resolution of ——— 1856."

Beneath such caption, properly filled out, appear the numbers and series of the checks.

The entry on the registry as to the $5 bills sued on is preceded by no caption or procès verbal whatever, and in a number of instances the series is not given.

The entry of the $10 bills or checks is regular in form, but on the margin is written, "Not issued," in the handwriting of the then cashier of the bank.

In the latter part of the year 1901 a large number of the $10 bills and of the $5 bills referred to, aggregating $10,365, reappeared in the possession of the plaintiff. Thus it is shown that the $10 bills certified on the record as not issued were found in company with the $5 bills, which the record shows

were not certified as issued, and plaintiff admits that all were in one and the same trunk when they came into his possession. These bills found in possession of plaintiff more than 45 years after their date were new, crisp, clean, and the numbers ran in regular sequence, which would not have been the case, had they been put in circulation during the existence of the bank. It is not credible that these bills were issued in globo, and kept in globo for 45 years by the holder or holders thereof.

We therefore think that the evidence establishes with a reasonable degree of certainty that the bills sued on were never issued and put in circulation by the bank in the year 1856 or subsequently, but were either lost or stolen.

Hence we must consider the law applicable to such a state of facts as against the possessor of such bills.

In Bank v. Bank, 9 Mart. (O. S.) 398, it was held that possession is prima facie evidence of property in a bank note alleged to have been stolen from the holder, and that the burden of proof was on the defendant bank to show that plaintiff bank received the note in bad faith, and with a knowledge that it was stolen. The note was in circulation, and had been stolen from the holder, and there was no evidence to show how plaintiff had acquired it.

Where a stolen bank note has been acquired for full value, in the usual course of business, and without any notice of the circumstances, the holder will recover; but the finder of a bank note acquires no title as against the owner. Daniel, Neg. Ins. (5th Ed.) 1674.

The same author states the American doctrine to be that a holder of a bank note "can rest secure in its possession, as the evidence of his right to recover, until the defendant shows that he was in privity with the fraud, or acquired the note mala fide or with notice." Id. 1680.

This distinction between bank notes and other negotiable instruments is not admitted in England, except as to the notes of the Bank of England; and the American doctrine seems to rest on the difficulty, if not impossibility, of a business man proving when or where, or from whom, or for what consideration, he received any particular bank notes in his cash drawer. Id.

The sum and substance of all the authorities cited by counsel is that a bank bill stolen from a bank and fraudulently put in circulation is good, as against the bank, in the hands of a bona fide holder for value, and that the mere possession of any holder is sufficient to impose the burden of proof on the bank to show the fraud or bad faith of the plaintiff. The same principle applies to bank bills which have been lost by the bank.

But neither the thief, nor the finder, nor the holder in bad faith, who has good reason to believe that the bill has been stolen or lost, can recover on the instrument.

The crucial question in this case is whether the evidence shows that plaintiff was a holder in bad faith.

The testimony of the plaintiff is so shuffling and evasive that it is difficult to extract therefrom any intelligent statement of how he acquired possession of the bank bills in controversy. He purchased them from an "old woman," but cannot give her name, though he had dealings with her a number of times, and took her receipts, which, however, he failed to produce. When asked to state the residence of this "old woman," he replied, "Somewhere in the city of New Orleans," and, when further questioned, named a particular street, but could not locate the square, though he had been to her house "twelve times." This "old woman" was not produced, nor her absence accounted for. Question after question was asked him in vain, with the view of extracting a statement of the amount he paid for the notes sued on. The following is a sample of his replies:

"Q. How much did you pay her for the $9,190?

"A. I bought the whole trunk. I bought some furniture, and there was some books, and some Confederate notes, and some other notes.

"Q. How much did you pay for the whole lot?

"A. I would have to look for some receipts. I don't know if I got them or not.

"Q. How much did you pay for the old trunk, the old notes, the old Confederate money, and the old furniture?

"A. I can't remember."

The inquiry was pursued on the same line at great length in order to get some definite answer as to what was paid for the old trunk and contents, including the notes sued on, but the witness could not remember whether the sum paid was less or more than $25. In short, the witness would or could not state any sum whatever.

When the plaintiff obtained possession of these notes, he did not consider them as having any value as money. He caused them to be hawked around through third persons, and offered for sale as curios in the same manner as Confederate notes. Several packages of these notes were offered to Hawkins, the well-known dealer in art antiques. He made three purchases, taking, in all, 13 $5 bills, for which he paid 75 cents. Two of these sales were made by two young men, one of whom was the son of plaintiff. Mr. Hawkins testified that the notes were brand-new—never had been handled—and the numbers ran equally or in rotation, and that he told the parties selling that the notes were of no value, and could not have been issued or circulated.

Another dealer in antiques declined to purchase on any terms.

According to plaintiff's testimony, he made a number of purchases of bank notes from the "old woman," and, after the bank had paid a few of the notes, he made the deal by which he acquired the notes sued on. If he did so, he committed a fraud on his ven-

-dor; paying about $25 for $10,365 of good bank paper. If, however, plaintiff purchased from a person who offered to take that insignificant price, he is chargeable with implied notice that there was something wrong about the transaction; and, if he took the notes without inquiry, he should not be protected. Such conduct "may be regarded as willful or fraudulent blindness, and abstinence from inquiry, so great as to amount to evidence of bad faith." Daniel, supra, 777a.

The same writer says:

"Where the plaintiff, knowing that the maker was able to pay, bought his note for $300 from a third party, paying only $5; and the note had been executed without consideration, it was held the mere nominal price charged him with constructive notice of the defect." Id. 778.

Plaintiff, on his own showing, purchased above $10,000 of bank notes from a poor "old woman" for an insignificant price, without making any inquiry whatever. Her possession of such an amount of notes was suspicious, and her willingness to sell for a nominal price was more suspicious. Plaintiff, if blind, was willfully blind, and he cannot be considered otherwise than a purchaser in bad faith and with notice. The bank received no consideration for the notes, and plaintiff cannot be permitted to enrich himself at the expense of defendant corporation.

In our estimation of the facts of this case, plaintiff tried, but failed, to show title by purchase, or how he came into possession of the notes in controversy, and must be considered in no better position than the finder of bank notes never issued, and either lost or stolen.

He did not present the notes for payment, as any holder in good faith would have done, but presented small numbers at different times, through the interposition of third persons, one of whom was a note broker, who received for his services 10 per cent. of the amount collected. The notes so presented appeared to be genuine, and were paid by defendant bank in ignorance of the facts; its officers, however, taking a memorandum of each payment, and of the name of the person receiving the same. Suspicion was not aroused until plaintiff's son claimed that he had a large amount of such notes. The matter was then investigated, and it was ascertained that the bills in question had not been issued by the former bank. It may be here stated that no bills of said bank had been presented for redemption to its successor for a number of years, but that the payments were made on the supposition that some of such bills might be outstanding, in the hands of bona fide holders.

He who receives what is not due him obliges himself to restore it to him from whom he had unduly received it. Civ. Code, art. 2301.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed; and it is now ordered and decreed that plaintiff's demand be rejected, and his suit dismissed, with costs; and it is further ordered and decreed that defendant herein, the State National Bank, do have and recover of the plaintiff, J. B. Pelletier, the full sum of $1,180, with 5 per cent. interest thereon from December 26, 1901, until paid, and all costs of said defendant's reconventional demand.